UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

DAVID DUNLAP,                    )
                                 )
        Plaintiff,               )
                                 )
v.                               )        Case No. 3:04-0045
                                 )        Judge Haynes
TENNESSEE VALLEY AUTHORITY,      )
                                 )
        Defendant.               )

## MEMORANDUM

Plaintiff, David Dunlap, filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et. seq. against the Defendant Tennessee Valley Authority ("TVA").[1] Plaintiff asserts claims of race discrimination in the Defendant's hiring decision at one of TVA's plants and a racially hostile work environment at that plant. The Defendant filed an answer denying Plaintiff's allegations and the parties proceeded with discovery.

In earlier proceedings, the Court denied Defendants' motion for partial summary judgment (Docket Entry No. 15) concluding that Plaintiff was not required to exhaust his administrative remedies on his compensatory damages claim, but that Plaintiff was not entitled to a jury trial. (Docket Entry No. 42, Order). The Court also denied the Defendant's motion for summary judgment on the merits concluding that Plaintiff's proof was sufficient to present a prima facie showing of race discrimination and that material factual disputes existed on whether the Defendant had legitimate and nondiscriminatory reasons for not selecting Plaintiff for the position at issue. (Docket Entry Nos. 48, 62 and 63). Plaintiff conceded that he would not pursue an independent claim of hostile

---

[1]The original Defendants were Craven Crowell, Glenn L. McCullough, Jr., Skila Harris and Bill Baxter, current and former members of the TVA board of directors, but TVA was substituted as the real party in interest. (Docket Entry No. 63).

work environment. (Docket Entry No. 51 at p. 11).

An evidentiary hearing was held on May 9, 10 and 11, 2006 after which the parties submitted proposed findings of fact and conclusions of law as well as supplemental findings. (Docket Entry Nos. 81, 83, 84 and 85). Set forth below are the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

## A. Findings of Fact

Plaintiff, David Dunlap, an African-American, was a contract worker as a laborer and boilermaker at TVA plants for fifteen to sixteen years. Plaintiff has previously applied for the position of boilermaker at TVA eight (8) times, but was not interviewed until the 2000 selection process at issue. Plaintiff had supervisory experience, and extensive job experience at TVA working on TVA equipment and components of boilers.

In early 2000, TVA solicited the boilermakers union for referrals of ten to twenty candidates to fill vacant boilermaker positions at its Cumberland plant.[2] In response, the Boilermaker local union submitted its entire membership list of 455 names. Twenty-four (24) individuals actually applied for this position. Of those twenty-four (24) individuals, twenty-two (22) applicants were on the union referral list and lived within the established commuting area. In agreement with the local union, the plant managers decided to interview only twenty-two (22) candidates. One of those individuals declined the interview. After consulting with the local union, the remaining twenty-one (21) candidates were interviewed for the ten available boilermaker positions.

---

[2]TVA had a Memorandum of Understanding (MOU) with the trades and labor unions under which that plant site employees were given the opportunity to express interest by an internal announcement for these Boilermaker positions. Here, the collective bargaining agreement covering TVA trades and labor positions applied to the positions at issue.

2

The Cumberland plant selection committee consisted of six members, five Caucasians and one African-American. In his past experiences, Plaintiff noted a pattern that the TVA selection committee would all be white except for one (1) African-American. Phillip Taylor, a management official on the selection team admitted that he has never sat on a selection committee where two (2) African-Americans were hired.

The selection committee was provided some training on TVA's "structured interview process." The selection committee listed five qualification standards for the selection process and agreed upon twenty-one (21) questions for each candidate and discussed appropriate answers for each question. The committee relied upon its members with boilermaker experience to develop the technical questions, but were assisted by management and human resources employees. The selection committee determined that the functions and accountabilities for the boilermaker position would account for 30 percent of the applicant's total score and the oral interview scores would account for 70 percent of the applicant's total score. The selection committee placed a heavier emphasis on the applicant's oral interview, contending that the applicants' resumes and other papers were inadequate. TVA's agreement with the Union authorizes a written test, but the Cumberland plant management elected not to do so.

Each of the six selection team members recorded his own numerical evaluation of the applicant's responses to each question. Yet, after each interview, the team members reviewed each member's scores to insure that none ranked a candidate higher or lower on a question than other team members. Ostensibly, this consensus ratings was intended to eliminate bias. As examples of the subjectiveness of this selection process, Plaintiff cites the scoring of applicants' responses. For question number 14, "What is your attendance record over the past five (5) years?" Plaintiff

3

answered that his attendance was a ninety-nine (99%) percent, good attendance, and he was off some days due to family illness. Plaintiff received a score of 3.7. Roby, a white applicant, answered questions that he has been out maybe four (4) days in five (5) years for illness and receives a 4.2. Sills, who is white, answered question number 14 that he had been off four (4) days, due to illness and stomach problems. Sills received a score of 5.5. On question number 10 -" What is your safety record?" Plaintiff answered that he had no safety violations and received a score of 4. Sills answered the same question that he had had two (2) accidents in eleven (11) years and received a score of 6. Plaintiff notes that scores were changed as many as seventy (70) times for applicants. Plaintiff's Exhibit No. 10 at pp. 4-7.

Because two of the candidates were entitled to veterans' preference, the selection committee ranked the candidates as outstanding, well qualified, and qualified. This classification occurred after the conclusion of the interviews and after the candidates had been ranked. Under TVA's veterans' preference procedures, the committee determined the groupings utilizing the consensus scoring system. The outstanding group consisted of the ten highest ranked candidates; the well-qualified group consisted of candidates ranked eleven through seventeen; and the qualified group consisted of candidates ranked eighteen through twenty-one.

The selection committee presented its list of applicants to Leonard Hancock, the Cumberland plant manager who had the final authority on hiring at the plant and had approved the members of that committee. Hancock earlier told the committee to be sure that everyone was given equal opportunity for the positions. (Transcript, Vol. II at p. 8). After the selection committee's report ranking the applicants, Hancock reviewed the selection procedure and conducted two meetings with the selection committee at which he "sat down with the whole team and went over their

4

documentation", id. , to be sure that there was no bias and "that everybody was given the same opportunity to get the job." Id. at 10.

In his review, Hancock discovered a mathematical error and instructed the committee to correct this error before his final decision. The corrected scores did not alter the committee's initial ranking of the candidates. (Transcript, Vol. II at p. 9, 177-78). After a second meeting, Hancock concurred in the team's recommendations.

Of the committee's ten finalists, nine were Caucasian and one was African-American. The selected candidates' composite scores were: Donnie Pierport, Caucasian, (8752); Stanley Tummins, Caucasian, (8734); Dean Baker, Caucasian, (8616); James Thomas, Caucasian, (8465); Kenny Harris, Caucasian, (8300); William Parchman, African-American, (7922); Jason Sills, Caucasian, (7791); Mike Finch, Caucasian, (7180); Tate Ruby, Caucasian, (6536); and Walter Spears, Caucasian (6246). The Plaintiff's score was 5402. For the job that Plaintiff applied for, one of three African-American applicants was hired and nine of eighteen whites applicants were hired. Of the eleven candidates who were not selected, six Caucasian candidates scored lower than the Plaintiff and four Caucasian candidates scored higher than the Plaintiff.

Plaintiff who ranked fourteenth among the twenty-one (21) candidates, challenges his non-selection for one of the boilermaker positions. Plaintiff's score on qualifications equaled the scores of five of the selected candidates. Yet, Plaintiff's oral interview score was 68.6, that is 11.2 points lower than the lowest of the selected candidates. The members of the selection team described Plaintiff's interview as poor, noting that many of his responses were incomplete or otherwise inadequate. Plaintiff asserts that he is more qualified than white candidates, Roby, Sills and Finch, because they averaged five to six years of experience, compared to his more than twenty years of

5

experience. Of the Caucasian candidates who were not selected, some had more years of service than Plaintiff, but Plaintiff had more years of service and experiences than Roby, Sills and Finch. Id. Plaintiff also noted that Roby's application was submitted after the deadline, despite a plant policy not to accept late applications. Compare Plaintiff's Exhibit 1at p. 2 and Plaintiff Exhibit 8. See also Plaintiff's Exhibit 10 at p.8.

Of the boilermakers selected, Plaintiff cites evidence of family connections in these hirings. Tate Ruby is related to Phillip Taylor, another TVA employee by marriage. Roby, a white male, was then twenty-nine (29) years of age and had only a few years of experience as a boilermaker. Jason Sills, another successful applicant is a white male who is the nephew of Tommy Andrews, a TVA manager. At the time, Sills was only thirty-two (32) years old with only a few years of boilermaker experience. Kenny Harris, another successful applicant is a thirty (30) year old white male who had less experience than Plaintiff, but had a family connection at TVA.

Plaintiff discussed his non-selection with Hancock. Hancock told Plaintiff that he was not qualified, could not get along with others, did not do anything for the community and did not have any supervisory experience. Aside from his boilermaker work, Plaintiff is also an elected representative in his home town. Plaintiff is now a journeyman boilermaker at TVA's New Johnsonville Fossil Plant, but has incurred increased transportation costs for this job.

Plaintiff testified that when he approached Hancock about why he was not selected, Hancock responded that he had his "quota of minorities." Hancock denied ever talking to Plaintiff except in formal proceedings. The Defendant notes that in his EEOC complaint, in his administrative charge and at the administrative hearing, Plaintiff never testified about this remark by Hancock. In response to a question by a TVA investigator, Plaintiff was asked about statements to him by plant

6

management, but did not disclose this statement by Hancock. Defendant's Exhibit 25. In his administrative charge, Plaintiff asserted that Hancock did not select him as the result of political vindictiveness. Plaintiff explained that he was not represented by a lawyer in these administrative proceedings. The Court credits the Defendant's argument that in all likelihood, based on Plaintiff's repeated failures to disclose, Hancock did not make this statement to Plaintiff.

In any event, Hancock testified that he was aware of TVA's goals for minority hiring in his review of these candidates. Yet, Hancock did not recall the number of black employees at his plant. Thus, aside from Plaintiff's testimony on this statement, Hancock conceded that he considered the diversity issue in this selection process. Whether Hancock actually selected candidates to satisfy his view of TVA's diversity policy is a separate issue.

The Court finds that in all likelihood, Hancock concluded that if he selected one black employee for these positions he could satisfy TVA's policy and thereafter he would be free to hire his personal preferences. As detailed below, the Court also finds that the Cumberland plant's selection process operates to exclude black applicants who are better qualified than the white applicants selected for full-time jobs at the plant.

Plaintiff's expert, Dr. William P. Anthony, a Ph.D. and Professor of Management, College of Business, Florida State University specializes in human resources management, and serves as Director of the Dr. Santis Center for Executive Education. Dr. Anthony has published a book, Human Resource Management, 4th edition, Southwestern Publishing, 2002, a collegiate textbook for schools of business and colleges throughout the United States. Dr. Anthony has testified in Title VII actions for wrongful discharge, harassment, and related areas. After his study of the TVA's selection process, Dr. Anthony found that TVA's policies and procedures were not followed and the

7

process at the Cumberland plant created an environment for racial bias and discrimination.

According to Dr. Anthony, the Cumberland Plant's application process was developed by Roseann Sietins, TVA's human resource representative and is called a "structural behavior interviewing" process. This process develops questions to elicit responses that relate to the behaviors expected in a job. According to Dr. Anthony, the protocol for the process usually involves a six-step process, including, a job analysis of knowledge, skills and abilities (KSAs) for the job; questions to elicit desired behaviors based on the KSAs; validation of questions to determine benchmark acceptable responses; training interviewers for role-playing, note taking skills, forming judgments against benchmark answers and avoiding bias; conducting interviews to minimize bias; and an objective evaluation of respondents' answers. In Dr. Anthony's opinion, Cumberland's selection committee process failed to meet these requirements.

Dr. Anthony noted the lack of a job analysis to determine the necessary knowledge, skills and abilities for the position. Dr. Anthony noted that the applicants' relevant experiences and qualifications were underweighted in this selection process, because only thirty percent (30%) of the evaluation criteria related to qualifications and experience. The oral interview constituted 70% of the total scoring. In Dr. Anthony's opinion, such a weighted factor gives an unfair advantage to candidates who interview well, a factor unrelated to a qualified boilermaker. According to Dr. Anthony, the work background and qualifications of candidates should have counted for at least fifty percent (50%).

In addition, Dr. Anthony opines that previous performance appraisals and reviews by former supervisors should have been reviewed, including disciplinary records, performance citations, so that complete picture of the candidate emerged. Dr. Anthony notes that TVA policy requires that the

8

candidate's ". . . personal history record (PHRs), resumes, applications, and other background information" to be examined (Plaintiff's Exhibit 14-5, TVA Policies, Filling Vacant Positions, at p. 5).

Dr. Anthony also cited the absence of validation of the questions with a sample of job incumbents to ensure the validity of the questions as well as the lack of training for the interviewees. The lack of training was exacerbated by the fact that some interviewers knew some of the candidates. Dr. Anthony found that procedures and protocols were not developed to minimize bias in this selection process.

Dr. Anthony found that candidate responses were not evaluated and scored in an objective fashion. As a special example, one-half (½) points were given if the candidates answered the first question with "yes mam" instead of "yes" and other interviewers subtracting half (½) points Dr. Anthony notes that this scoring element is not an essential to the applicant's knowledge, skill and ability. Given some of the questions asked and the scoring of candidates, the interviewers also lacked of understanding of the job's specifications and in Dr. Anthony's opinion, this flawed process fosters bias in the evaluation process.

In Dr. Anthony's opinion, these deficiencies rendered the committee's questions invalid. Dr. Anthony found that the committee's actual questions were not tied to the knowledge, skills and abilities of the position because only ten (10) questions of the 21 questions were technical and eleven (11) were general. In his view, the selection committee's consensus scoring of applicants was also flawed.

Finally, Dr. Anthony cited the absence of any discussion by the interview panel members of TVA's affirmative action plan prior to the interviews. Under that plan, if a minority candidate is

9

"well qualified" for a job, he/she should be offered that position to achieve the plant's goal for ". . . a competent and diverse workforce." (Plaintiff's Exhibit 14-5, Filling Vacant Positions, at p. 1).

It is undisputed that TVA's Affirmative Employment Program Accomplishment Report for fiscal year 1999, set a goal of 902 minority employees for the 5,068 trades, labor and blue collar employees that include boilermakers. At that time, of the 5,068 employees, 528 were minorities. Plaintiff's Exhibit 15. As of September 30, 1999, blacks in Trades and Labor market were under represented by forty-four percent (44%). Id. By fiscal year 2000, 523 of TVA's 5,078 Trades and Labor employees were minorities. Plaintiff's Exhibit 16. By the beginning of the 2001 fiscal year, of the 5,274 Trade and Labor employees, 558 were minorities. Plaintiff's Exhibit 17. Here, when Plaintiff applied to be a boilermaker, TVA had a target of employing nine hundred four (904) minorities. Plaintiff's Exhibit 16. There was a shortfall of three hundred eighty-one (381) minorities at the time these positions were filled. Id.

Defendant notes that neither its selection policy nor its affirmative action policy requires a discussion of TVA's affirmative action polices in the selection process.

## B. Conclusions of Law

As a threshold issue, in its post-hearing submission, the Defendant now raises an affirmative defense that Plaintiff failed to exhaust administrative remedies because Plaintiff allegedly failed consult TVA's EEO's officer about his non-selection for this position. This issue was not raised in the Defendant's administrative process nor its administrative hearing nor in its answer or pretrial motions in this action. The Court deems this defense waived and holds that the Defendant is equitably estopped from asserting this defense at this stage of the action.

In any event, the proof at trial is that Plaintiff did discuss his non-selection for the job at issue

10

with TVA's EEO officer. The EEOC issued its decision in this matter on August 26, 2003, and specifically found that: "On July 24, 2000, the Complainant filed a timely formal complaint of discrimination, alleging race discrimination." The agency did not contest this finding throughout the administrative proceeding, nor in its Answer filed in this action on March 29, 2004, (Docket Entry No. 8) or during the trial of this action.

Title VII prohibits an employer from discriminating against any individual employee on the basis of race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a). As applicable here, Title VII has two distinct theories of liability. First is the disparate impact theory under <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424 (1971), for which the Title VII plaintiff must prove that a specific employment practice disproportionately impacts a substantial number of a protected group. Plaintiff proof of discriminatory intent is not required. The rationale of this theory is that an employment practice adopted without a deliberately discriminatory motive, in fact, may be the functional equivalent of intentional discrimination and thus, a Title VII violation. <u>Watson v. Fort Worth Bank & Trust Co.</u>, 487 U.S. 977, 987 (1988).

The second theory is the disparate treatment theory under which Plaintiff must prove that the employer treated a protected employee less favorably than a white employee in similar circumstances and proof of intentional discrimination is required. <u>Teamsters v. United States</u>, 431 U.S. 325, 335 n. 15 (1977). Under disparate treatment theory, a plaintiff may submit direct or circumstantial evidence of discrimination. <u>Woythal v Tex-Tenn. Corp.</u>, 112 F.3d 243, 246 (6th Cir. 1997).

In <u>Watson</u>, the Supreme Court explained the necessary evidentiary requirements for an individual Title VII plaintiff to recover under the disparate impact theory. The Court stated:

First, we note that the plaintiff's burden in establishing a <u>prima facie</u> case goes

11

beyond the need to show that there are statistical disparities in the employer's work force. The plaintiff must begin by identifying the specific employment practice that is challenged. Although this has been relatively easy to do in challenges to standardize tests, it may sometimes be more difficult when subjective selection criteria are at issue. Especially in cases where an employer combines subjective criteria with the use of more rigid standardized rules or tests, the plaintiff is in our view responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.

Once the employment practice at issue has been identified, causation must be proved; that is, the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group. Our formulations, which have never been framed in terms of any rigid mathematical formula, have consistently stressed that statistical disparities must be sufficiently substantial that they raise such an inference of causation . . . [The] plaintiffs are required to show that [the practice] in question selects applicants for hire or promotion in a racial [or sexual] pattern significantly different from that of the pool of applicants.

Watson, 487 U.S. at 994-95. (emphasis added and citations omitted).

In Watson, the Supreme Court explained that the Plaintiff need not prove intentional discrimination:

The factual issues and the character of the evidence are inevitably somewhat different when the plaintiff is exempted from the need to prove intentional discrimination. See Burdine, supra, 450 U.S., at 252, n. 5, 101 S.Ct. 1093, n. 5; see also United States Postal Service Bd. of Governors v. Aikens, supra, 460 U.S., at 713, n. 1, 103 S.Ct., at 1480, n. 1; McDonnell Douglas, 411 U.S., at 802, n. 14, 93 S.Ct., at 1824, n. 14; Teamsters, supra, 431 U.S., at 335-336, n. 15, 97 S.Ct., at 2729-2730, n. 15. The evidence in these "disparate impact" cases usually focuses on statistical disparities, rather than specific incidents, and on competing explanations for those disparities.

* * *

Rather, the necessary premise of the disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination

Perhaps the most obvious examples of such functional equivalence have been found where facially neutral job requirements necessarily operated to perpetuate the effects of intentional discrimination that occurred before Title VII was enacted . . . Such

12

conduct had apparently ceased thereafter, but the employer continued to follow employment policies that had "a markedly disproportionate" adverse effect on blacks.

Watson, 487 U.S. at 987.

The Supreme Court warned about consideration of statistical proof to establish a Title VII claim:

> Nor are courts or defendants obliged to assume that plaintiffs' statistical evidence is reliable. "If the employer discerns fallacies or deficiencies in the data offered by the plaintiff, he is free to adduce countervailing evidence of his own . . . They may endeavor to impeach the reliability of the statistical evidence, they may offer rebutting evidence, or they may disparage in arguments or in briefs the probative weight which the plaintiffs' evidence should be accorded." Without attempting to catalogue all the weaknesses that may be found in such evidence, we may note the typical examples include small or incomplete data sets and inadequate statistical techniques [citation omitted].

Id. at 996 (quoting Dothard v. Rawlinson, 433 U.S. 321, 331 (1977) with other citations omitted).

In Alexander v. Local 496, Laborers' International Union of North America, 177 F.3d 394 (6th Cir. 1999), the Sixth Circuit noted that the statistical proof does not have to be conclusive:

> [P]laintiffs who present a statistical analysis of some challenged practice need not rule out all other variables to prevail. See United States v. City of Warren, 138, F.3d 1083, 1094 (6th Cir. 1998) (Citation omitted); see also Bazemore v. Friday, 478 U.S. 385, 400, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) ("A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather his or her burden is to prove discrimination by a preponderance of the evidence.").

Id. at 406. Yet, "[w]hen special qualifications are required to fill particular jobs, comparisons to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value." Middleton v. City of Flint, Mich., 92 F.3d 396, 402 (6th Cir. 1996).

Here, Plaintiff challenges the Defendant's selection committee's questions and scoring of the applications to rate technical abilities and actual job experiences at 30% of the total score and oral

13

interview skills at 70%. Where the issue is the validity of job criteria "[a] test will have content validity if there is a direct relationship between the test contents and the job contents." Williams v. Ford Motor Co., 187 F.3d 533, 540 (6th Cir. 1999) (citing Police Officer for Equal Rights v. City of Columbus, 644 F.Supp. 393, 414 (S.D. Ohio 1985).

Use of subjective employment criteria practices can be actionable under Title VII, as the Supreme Court noted in Watson:

> We are persuaded that our decisions in Griggs and succeeding cases could largely be nullified if disparate impact analysis were applied only to standardized selection practices. However one might distinguish "subjective" from "objective" criteria, it is apparent that selection systems that combine both types would generally have to be considered subjective in nature.
>
> * * *
>
> We are also persuaded that disparate impact analysis is in principle no less applicable to subjective employment criteria than to objective or standardized tests. In either case, a facially neutral practice, adopted without discriminatory intent, may have effects that are indistinguishable from intentionally discriminatory practices...[E]ven if one assumed that any such discrimination can be adequately policed through disparate treatment analysis, the problem of subconscious stereotypes and prejudices would remain. . . . If an employer's undisciplined system of subjective decisionmaking has precisely the same effects as a system pervaded by impermissible intentional discrimination, it is difficult to see why Title VII's proscription against discriminatory actions should not apply. In both circumstances, the employer's practices may be said to "adversely affect [an individual's] status as an employee, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(2). We conclude, accordingly, that subjective or discretionary employment practices may be analyzed under the disparate impact approach in appropriate cases.

487 U.S. at 989-991.

Promotion decisions that are based upon subjective criteria are a ready mechanism for racial discrimination. Rowe v. General Motors Corp., 457 F.2d 348, 358-59 (5th Cir. 1972). In Alexander, a disparate impact theory action, the Sixth Circuit found a Title VII violation in a union's preference in referring relatives of union members where the membership was overwhelmingly white and that

14

practice had a disparate impact on black workers. 177 F.3d at 406-07 (citations omitted) .

Plaintiff's proof establishes disparate impact in the hiring process at TVA's Cumberland plant. Substantial statistical underrepresentation of African-Americans exists in the trade and labor positions at TVA plants, including boilermakers. TVA's Affirmative Employment Program Accomplishment Report for fiscal year 1999, set a goal of 902 minority employees for the 5,068 Trades and Labor or blue collar employees that include boilermakers. Plaintiff's Exhibit 15. At that time, of the 5,068 employees, 528 were minorities. Id. As of September 30, 1999, blacks in Trades and Labor market were under represented by forty-four percent (44%). Id. By fiscal year 2000, 523 of TVA's 5,078 Trades and Labor employees were minorities. Plaintiff's Exhibit 16. By the beginning of the 2001 fiscal year, of the 5,274 Trade and Labor employees, 558 were minorities. Plaintiff's Exhibit 17. For the fiscal year in which Plaintiff applied to be a boilermaker, TVA's target was to have nine hundred four (904) minority employees, but actually employed three hundred eighty-one (381) minorities at the time this disputed selection process.

To be sure, proof of any employer's affirmative action policy alone does not establish a Title VII violation, Long v. Runyon, 1 F.3d 1241 (6th Cir. 1993), but the statistical evidence in such a plan can be considered with other evidence of a Title VII violation.

Aside from the substantial statistical proof in the hiring process at the Cumberland plant, the candidate's oral interview comprised seventy percent (70%) of an applicant's total score for a job that is inherently and highly technical. The majority of these questions are not job related for this inherently technical position. The Plaintiff's proof also includes expert testimony that the Cumberland plant management utilizes subjective hiring criteria. The plant's selection committee utilized a questionnaire that was not validated. Each interviewee was asked the same questions, but

15

the selection team shared notes and agreed on the score or range of scores to be given. The Defendant contends that its selection committee's consensus scoring of candidates was intended to eliminate bias. Given the racial makeup of the committee, coupled with its subjective hiring criteria, the Court finds that consensus scoring can mask racial motivations in hiring matters at the TVA Cumberland plant. The evidence on this hiring process also reveals management's hiring preferences for family members of employees at the Cumberland plant.

Evidence of the historical difficulties of black contract workers in securing full-time positions at the TVA Cumberland plant is verified by Plaintiff's brother-in-law, William Parchman, an African-American. Parchman had been a contract worker at TVA plants for twenty five years and boilermaker for thirty six years. For years, Parchman applied for full-time positions at TVA plants, but was not interviewed until 2000. Before 2000, Parchman applied for a boilermaker position at the TVA Cumberland plant six times and two times at other TVA plants. Parchman filed an EEO complaint that took two to three years to complete. In 2000, Parchman was selected for a position at the Cumberland plant. This evidence must be considered with other evidence about the job selection process at TVA's Cumberland plant.

Based upon the Defendants' statistical racial imbalance in its workforce, Plaintiff's expert proof of the Defendants' subjective and invalid hiring criteria, and Plaintiff's other proof, the Court concludes that Plaintiff has satisfied the requirements of a prima facie showing under the disparate impact theory.

Upon a prima facie showing of disparate impact, Watson imposes the following requirements:

Thus, when a plaintiff has made out a prima facie case of disparate impact, and when

16

the defendant has met its burden of producing evidence that its employment practices are based on legitimate business reasons, the plaintiff must "show that other tests or selection devices, without a similarly undesirable racial effect, would also serve the employer's legitimate interest in efficient and trustworthy workmanship." Albemarle Paper Co., 422 U.S., at 425, 95 S.Ct., at 2375 (citation omitted; internal quotation marks omitted).

487 U.S. at 998.

The Supreme Court noted that under the disparate impact theory, a Title VII defendant can defend the challenged practice on the grounds of business necessity. The Supreme Court, however, observed in Watson that:

[T]he ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff at all times. . . . Factors such as the cost or other burdens of proposed alternative selection devices are relevant in determining whether they would be equally as effective as the challenged practice in serving the employers legitimate business goals. The same factors would also be relevant in determining whether the challenged practice has operated as the functional equivalent of a pretext for discriminatory treatment.

487 U.S. at 997-98.

In the Court's view, TVA has not established a justification for these subjective hiring criteria and processes for these highly technical positions. The Court concludes that TVA's proof does not establish a legitimate business need for these subjective hiring practices. Accordingly, the Court concludes that Plaintiff should prevail on his disparate impact claim.

For Plaintiff's second theory, disparate treatment, Plaintiff can present direct or circumstantial evidence. Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was a motivating factor in the employer's action. Abbott v. Crown Motor Co., Inc. 348 F.3d 537, 542 (6th Cir. 2003). If direct evidence of discrimination is relied upon, the burden shifts to the defendant to prove by a preponderance of the evidence that the same

17

employment decision would have been made in the absence of the discriminatory motive. Plaintiff argues that Hancock's disputed statement constitutes direct evidence of racial discrimination. Hancock is cited as the decision-maker on why Plaintiff was not hired as a boilermaker. The Defendants argue that Hancock did not have a direct role in the selection team's failure to select Plaintiff. The Court credits the Defendant's argument that in all likelihood, based on Plaintiff's repeated failures to disclose, Hancock did not make this statement to Plaintiff.

The Sixth Circuit has held that comments made by individuals who are not involved in the decision-making process do not constitute direct evidence of discrimination. Hopson v. Daimler Chrysler Corp., 306 F.3d 427, 433 (6th Cir.2002) (a company manager's opinion that "race was a factor" in the company's decision not to promote the plaintiff was not direct evidence for purposes of the plaintiff's discrimination claim because the manager had "no involvement in the decision-making process with respect to the particular jobs at issue"). Under Hopson, Hancock's disputed statement is not direct evidence of the selection committee alleged racial discrimination. Plaintiff's other proof, consisting of circumstantial evidence, can establish discrimination. Carter v. University of Toledo 349 F.3d 269, 273 (6th Cir. 2003).

Where, as here, a Title VII plaintiff relies on circumstantial evidence in a disparate treatment action, the burden-shifting framework under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny apply. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); Texas Dep't of Comm. Affs. v. Burdine, 450 U.S. 248 (1981). Under this framework, to present a prima facie showing of discrimination, a plaintiff must prove (1) that he or she is a member of a protected minority, (2) that he or she was qualified for the position at issue; and (3) that he or she was treated differently than comparable white employees in the terms and conditions of employment. McDonnell

18

<u>Douglas</u>, 411 U.S. at 802.

Here Plaintiff's proof clearly established those elements. Plaintiff is an African-American who was qualified for this position and was not selected despite his highly relevant job experiences. White employees with substantially less relevant experiences were hired.

With this <u>prima</u> <u>facie</u> showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. <u>Id</u>. The defendant's burden is for the production of evidence, not the burden of persuasion. <u>Gagne v. Northwestern Nat'l Ins. Co.</u>, 881 F.2d 309, 314 (6th Cir. 1989). Once the defendant presents its reasons for the challenged action, the plaintiff must then produce "sufficient evidence to allow a jury to reasonably reject [the employer's] explanation" as a pretext for discrimination, <u>McDonnell Douglas</u>, 411 U.S. at 804, or that plaintiff's race was a substantial factor in the adverse employment decision. <u>Phelps v. Yale Sec. Inc.</u>, 986 F.2d 1020, 1023 (6th Cir. 1993).

To establish pretext, Plaintiff "may succeed...either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." <u>Burdine</u>, 450 U.S. at 256 (citing <u>McDonnell Douglas</u>, 411 U.S. at 804-5.). The Supreme Court in <u>Hicks</u>, made clear that "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." 509 U.S. at 518. Moreover, the Court held that "it is not enough . . . to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." <u>Id</u>. at 519 (emphasis added). Rejection of the proffered reasons as pretext, "permit[s] the trier of fact to infer the ultimate fact of intentional discrimination." <u>Id</u>. at 511. <u>See also</u> <u>Kline v. Tennessee Valley Authority</u>, 128 F.3d 337, 347 (6th Cir. 1997) ("The

19

import of the <u>Hicks</u> decision in this circuit is that once a plaintiff has disproved the reasons offered by the defendant, the fact finder is permitted to infer discrimination.").

Here, the Defendants' proof of legitimate business reasons focuses on its selection process that scored and ranked other candidates higher than Plaintiff for this highly technical job.

Proof of use of subjective criteria alone does not establish a Title VII claim. <u>See Eubanks v. Pickens-Bond Construction Co.</u>, 635 F.2d 1341, 1347 (8th Cir. 1980). To be sure, the employer's preference of a more qualified applicant constitutes a legitimate business decision. <u>Henry v. Lennox Industries, Inc.</u>, 768 F.2d 746, 751 (6th Cir. 1985). An employer's use of subjective hiring criteria, coupled with few, if any, black or female employees in supervisory positions, create a strong case of discrimination. <u>E.E.O.C. v. H & S Camp & Sons, Inc.</u>, 542 F.Supp. 411, 417 (M.D. Fla. 1982).

For the reasons stated earlier, Plaintiff had greater qualifications for this technical job than these other white applicants who were chosen. Plaintiff's expert's opined that the Defendant used the highly subjective selection criteria and that the Defendant's selection process permits racial bias. The Defendant chose other less qualified white employees with family ties to TVA employees. The Court finds that coupled ewith Plaintiff's other proof that Hancock considered TVA's diversity policy, but applied that policy to select one black applicant that would satisfy the TVA central management. Thereafter, Hancock felt free to select his personal preferences even though Plaintiff, another black applicant, had much more relevant work experiences and qualifications as a boilermaker than the successful white applicants who had families ties to TVA Cumberland plant personnel. The Defendant's flawed scoring system was used to mask this preferential hiring process.

Based upon the Court's findings on Plaintiff's disparate impact claim and the selection committee's flawed process, the Court concludes that the Defendant has not established legitimate

20

business reasons for its hiring process. Thus, Plaintiff should also prevail on his disparate treatment claim.

Under Title VII, backpay is payable by the employer responsible for the unlawful employment practice. 42 U.S.C. §2000e-5(g)(1) and 42 U.S.C. §1981a (1998). The parties stipulated that the amount of Plaintiff's backpay is $39,414.76. (Docket Entry No. 83). Plaintiff would have received other awards totaling $3,341.79. Id. Thus, the total backpay award is $39,756.55. Plaintiff is awarded $10,000 in transportation expenses. Given his current employment as a boilermaker, other equitable relief is deemed moot.

Plaintiff is also entitled to recover for intentional discrimination, compensatory damages for - "... emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." The Court awards an equal amount of Plaintiff's backpay as compensation for these injuries. 42 U.S.C. §§ 1981a(b)(2) and 1981a(b)(3). Plaintiff is also awarded his reasonable attorney's fees and costs that will be determined pursuant to Local Rule 54.01.

An appropriate Order is filed herewith.

**ENTERED** this the _____ day of January, 2007.

WILLIAM J. HAYNES, JR.

21